321 So.2d 863 (1975)
TOM SLAY, INC.
v.
CONTINENTAL CASUALTY CO.
No. 10406.
Court of Appeal of Louisiana, First Circuit.
September 2, 1975.
Rehearing Denied November 24, 1975.
Writ Refused January 9, 1976.
Dileo & Myles, Lonny A. Myles, Hammond, for plaintiff-appellee.
Talley, Anthony, Hughes & Knight, John W. Anthony, Bogalusa, for defendant-appellant.
Before SARTAIN, COVINGTON and BARNETTE, JJ.
BARNETTE, Judge.
This is a suit for damages resulting from an accident in which a gravel truck and trailer were overturned after striking road repair equipment, specifically a roller, engaged in highway repair work. The trailer was damaged beyond repair. There was judgment for the plaintiff, for $3600 representing the value of the trailer destroyed less $400 salvage. In addition, plaintiff was awarded $12,000 for loss of profits from destruction of the truck and $446.05 for other special items of damage, a total of $16,066.05. From that judgment the defendants have appealed.
*864 The issues are liability and quantum. We will address ourselves first to the issue of liability.
Early on the morning of September 11, 1973, a gravel trailer truck of 22 cubic yards capacity owned by the plaintiff, Tom Slay, Inc. and operated at the time by Ollie Robertson, was loaded at a gravel pit in Franklinton and then proceeded from Franklinton to Richardson (a relatively short distance, but not specifically stated in the testimony) from which point he proceeded in a westerly direction on Louisiana Highway 10 toward Arcola.
At a point approximately a mile and a half west of Richardson in the direction of Arcola the defendant, Southeastern Paving Company[1] was engaged in road repairs described as patch work. The plaintiff, Tom Slay, Inc., was engaged in hauling gravel for Southeastern Paving Company at Amite, Louisiana. We assume from the testimony of plaintiff's witness, Raymond Gaines, who said he was also hauling for Southeastern Paving Company and was taking his load to Amite, that Ollie Robertson was also hauling to Amite, and not to the job-site at which the accident occurred.
As the driver, Ollie Robertson, approached the point of accident he came over a hill which curves to the right to the place where the road was blocked by the machinery engaged in repairing the road surface. The estimate of distance from the curve to the rollers engaged in the road work varied according to who was testifying, from approximately 30 yards (90 feet) by plaintiff's witness, Gaines, to 1000 feet by defendant's witness, Lawrence A. Pecoraro. At one point Gaines testified that the distance from the point in the curve from which he could see the rollers was "about thirty yards." At another point in his testimony he said there was a "spreader" down at the bridge (beyond the point of the accident) which he estimated to be 150 yards from the curve. He had stopped his truck where the rollers were at work in the roadway and estimated the distance from his truck to the spreader at 75 yards. This would place his truck 75 yards from the curve, rather than 30 yards.
Another witness for plaintiff, J. W. Morris, also a gravel truck driver, testified:
"A. When I got to the curve I could see anything.
"Q. All right. Then as you proceeded around the curve what did you see?
"A. Well, when I got around the curve I seen the road was filled with machinery and all.
"Q. Now how close to the machinery before you could see it?
"A. I'd say about a hundred, a hundred fifty foot.
"Q. A hundred to a hundred and fifty feet from where you can see it, from the point where you were to where you could see the equipment?
"A. Yes, sir."
The plaintiff's truck driver, Ollie Robertson, was questioned on the point of distance and visability from the curve and said he did not know. He was asked how far he traveled after applying his brakes until his truck came to a stop. He hedged on this question and said he did not know. When pressed for an estimate, he related the distance to a point in the court room, which the trial judge interjected to be approximately 60 feet.
On the other hand, defendant's witness, Pecoraro, testified that the distance from *865 the curve to the road machinery was about 1000 feet. When pressed for an estimate of distance from the curve to the bridge he also said "about a thousand feet." According to plaintiff's witness, Gaines, the bridge was 75 yards (225 feet) beyond the road machinery. This would place the road machinery about 875 feet from the curve.
The State Police officer, Clarence Wagner, who made an investigation of the accident identified a skid mark from the application of brakes running back from the over-turned truck 1000 feet. This distance he estimated from stepping it off.
We cannot reconcile these varied estimates to establish a distance in feet or yards, but we are of the opinion that the evidence clearly shows that Robertson had ample distance in which to stop his truck after the obstruction came into view when he came over the hill and around the curve. It is significant, we think, that Gaines, driving a gravel truck a few minutes ahead of Robertson, negotiated the hill and curve and brought his truck to a stop before reaching the road machinery. Gaines said he stopped 15 feet from the roller and put on his emergency flasher lights. Morris said he came up three or four minutes behind Robertson and had no trouble in bringing his truck to a stop.
There is a contradiction of testimony whether a flagman was on duty to stop approaching traffic and whether there was a warning sign posted some distance ahead to warn motorists of "Flagman ahead, 500 feet" or words to that effect.
Allen Hayes, an employee of Southeastern Paving Company was very positive in his testimony that he personally put out a sign warning of a flagman ahead about 500 feet east of where Mr. Pecoraro was flagging traffic near the crest of the hill.
Mr. Wagner, the investigating officer, testified that he saw the sign warning of a flagman ahead.
Allen Hayes testified that Pecoraro was flagging traffic immediately before the accident. He said he was operating one of the three rollers, the one in the middle. Jesse LaFountain was operating the one which was nearest the on-coming truck. Hayes was standing on his roller and saw Robertson coming at a speed which he estimated at 50 miles per hour. He shouted a warning to LaFountain and when he determined which way the truck was going he jumped off the opposite side and "took to the ditch." He said he did not notice skid marks.
This witness was very positive that Pecoraro was flagging traffic at the top of the hill; that he could clearly see him and that the distance was about 500 feet.
Jesse LaFountain operator of the roller which was struck also testified that Pecoraro was flagging traffic about 500 feet behind him in the middle of the road and that he had on a "State jacket." He also said he saw the warning sign which was placed about 500 feet east of the flagman; having seen it on his way up to where his roller was parked. He proceeded on his roller, passing the flagman, saying: "about thirty seconds or a minute, two minutes, something like that, I don't exactly know" before the accident. He was in the right hand lane going down the hill and switched over at the bottom to park his roller. Robertson's truck "sideswiped" LaFountain's roller and overturned in the ditch on the right (north) side of the road. This witness was moving in the same direction from which the truck was approaching and did not see it until it struck his roller and went in the ditch.
Lawrence A. Pecoraro, a retired State Police Officer was employed by Southeastern as a flagman. He testified that he was at his post of duty by 7:00 A.M. (the accident happened about 7:30 A.M.) and that he was wearing the traditional orange colored vest provided for that purpose. He testified that the "flagman ahead" *866 warning sign was placed about 250 feet east of where he was standing. He said he had stopped a pickup truck and two gravel trucks, one he described as a "bobtail" truck. This is the description Gaines gave of the truck he was driving. Pecoraro further testified that he saw Robertson approaching from the east; that he was about 600 feet from the accident scene "standing in the middle of the road" at the top of the hill and "* * * saw this other truck [Robertson] coming and I tried to flag him." He described it as a red truck-tractor and trailer loaded with gravel "coming up that hill, coming towards me." He said he tried to flag him and "Well, when I saw he wasn't going to stop, I took out for the woods."
In contradiction of these witnesses the plaintiff's witnesses, Gaines, Morris and Robertson, all testified that they saw no signs (except Gaines testified to seeing a low shoulder warning sign) and that there was no flagman to warn approaching motorists. Gaines further testified that the flagman, Pecoraro, came from "down by the spreader" and came "up in the curve" after the accident and "remarked that he hadn't went to work yet." Pecoraro denied making any such statement.
Gaines testified that he was stopped at the work site about 15 feet from the rollers with his 12 yard "bobtail" truck. He described the accident as follows:
"Ollie come around that curve and that's when he wrecked. I mean, he come around me and when he come around me the roller was about, I'd say, oh, twenty foot ahead of me and when he come around me he come around my truck and in between me and the roller. The trailer wheels hit the roller on the left side and it throwed him back around into the roller that was in front of that one and the steering axle hit him and it cut it short back across the road and he turned over."
He said he then got out of his truck and went back up the road to flag another of his trucks which he knew was following close behind.
The plaintiff's witnesses also denied seeing the skid mark which the State Trooper identified, but we are convinced that the skid mark was there. In the first place the investigating officer was under a duty to examine the scene for evidentiary signs, whereas the other witnesses were not and probably paid no attention to such. Furthermore, when Robertson was asked if his brakes held he answered: "They held. Burning. Almost burnt the tire off." This strongly corroborates the statement of the Trooper that a skid mark was made by a sliding tire and that the brakes were defective, apparently holding only on one side.
We do not have the benefit of the reasons for judgment of the trial judge and we have no way of knowing on what basis of fact he found judgment for the plaintiff. Evidently he found negligence on the part of the defendant and no contributory negligence on the part of plaintiff's driver, Ollie Robertson. We do not know if his judgment is based on credibility of witnesses. We do not know if he found as a fact that the defendant had set up a hazardous condition and failed to post a warning sign or a flagman or both. We do not know what, if any, credence he gave to the testimony of the disinterested State Trooper who was quite positive about the skid mark which he stepped off and estimated to be about 1000 feet extending back from the overturned truck. If he found this to be a fact, we do not know what significance he attached to it. We do not know what circumstances were controlling in finding Robertson free from contributory negligence.
We make specific reference to all these unanswered material issues of fact for the reason that we are fully aware of the manifest *867 error rule which gives great wright to the fact findings of the trial judge and restricts the appellate court in reversal. It is difficult for us to point to a specific manifest error of fact finding if we do not know what facts were found by the trial judge. For this reason we have discussed fully all the issues of fact which we think are material in support of our conclusion.
We point out that this irreconcilable conflict of testimony on material issues of fact is a conflict of positive or affirmative versus negative testimony. One set of witnesses were positive that a flagman was on duty. Others said they did not see him. One set of witnesses were positive that a warning sign was placed on the highway. The others said they did not see it. The State Trooper was positive about the skid mark, other witnesses said they did not see it.
When there are witnesses of equal credibility in direct contradiction on a fact question, the positive or affirmative testimony will be given preponderance over that which is negative. Staehle v. Leopold, 107 La. 399, 31 So. 882 (1902); Story v. Hope Insurance Company, 37 La.Ann. 254, at p. 258 (1885); Guesnard v. Executors of Bird, 33 La.Ann. 796, at p. 800 (1881); Sholar v. U.S. Fire Insurance Company, 261 So.2d 327 (La.App.1st Cir. 1972); Jamison v. Reese Variety Stores, Inc., 203 So.2d 859 (La.App.2nd Cir. 1967).
On the issue of the flagman, we are convinced that one was present at the job site. Whether or not he momentarily left his post of duty and hence was not seen by plaintiff's witnesses, we do not need to speculate, for we are further convinced that there was a warning sign posted at a proper distance to warn plaintiff's driver of construction ahead. This alone was sufficient to warn him to bring his truck under control and be prepared to stop.
We are convinced from the testimony of the State Trooper and the statement of Robertson that his brakes held and he "almost burnt the tire off" that a skid mark was made as the Trooper described. This clearly indicates defective brakes.
The plaintiff has failed, in our opinion, to establish negligence on the part of the defendant by a preponderance of the evidence. Furthermore, the evidence preponderates against the plaintiff on the issue of Robertson's negligence. In our opinion he was negligent in that he did not heed the warning sign and approached the work area too fast under hazardous conditions which should have been obvious to him. We find that he had sufficient distance in which to stop after completing the turn if he had been keeping a proper look out with his truck under control. We find that he was operating a truck with defective brakes which contributed to the truck's going out of control. His negligence, in any event, is a bar to plaintiff's recovery of damages.
As stated above, we do not know upon what facts the trial judge based his judgment for the plaintiff, but whatever his reasons, we are compelled to hold his conclusion of fact was manifestly erroneous.
We, therefore, need not discuss the issue of quantum.
The judgment appealed is reversed and there is now judgment in favor of the defendants and against the plaintiff, Tom Slay, Incorporated, rejecting its demands and dismissing its suit at its cost.
Reversed.
NOTES
[1] Suit was filed initially against Continental Casualty Company as insurer of Southeastern Paving Company. An amended petition was filed joining Southeastern Paving Company as a defendant.